CENTER FOR AUTO SAFETY, Public Citizen, Inc., Natural Resources Defense Council, Hon. Toby Moffett, Sidney Wolfe, M.D., and Russell J. Shew, Petitioners,

v.

William D. RUCKELSHAUS, Administrator, Environmental Protection Agency, and Environmental Protection Agency, Respondents,

General Motors Corp., Intervenor.

No. 82–2032.

United States Court of Appeals, District of Columbia Circuit.

Argued May 24, 1983.
Decided Oct. 26, 1984.

Frederic Townsend, Washington, D.C., with whom Alan B. Morrison and David D. Doniger, Washington, D.C., were on the brief, for petitioners.

William F. Pedersen, Acting Associate Gen. Counsel, E.P.A., Washington, D.C., of the Bar of the Supreme Court of the State of Massachusetts, pro hac vice, by special leave of Court, with whom Carol E. Dinkins, Asst. Atty. Gen., Robert M. Perry, Gen. Counsel, Gerald K. Gleason, Asst. Gen. Counsel, Samuel I. Gutter, Robert A. Weissman, Peter J. Murtha and Maureen Smith, Attys., E.P.A., and Rosanne Mayer, Atty. Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Theodore Souris, Detroit, Mich., with whom Frederick J. Dindoffer and George F. Ball, Detroit, Mich., were on the brief, for intervenor. William L. Weber, Detroit, Mich., also entered an appearance for intervenor.

Before WILKEY, MIKVA and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

Section 207 of the Clean Air Act, 42 U.S.C. § 7541 (1982) provides that if the Administrator of the Environmental Protection Agency ("EPA") determines that a substantial number of any class or category of vehicles or engines fail during their statutorily defined useful life to conform to the regulations establishing maximum emission levels, the Administrator shall require the manufacturer to submit a plan for remedying the nonconformity at the manufacturer's expense. The EPA has hitherto implemented this provision by requiring and approving plans that commit the manufacturer to recall and repair the nonconforming vehicles or engines. This case presents the question whether the EPA may implement it instead by approving a plan that commits the manufacturer to "offset" the excessive pollution emitted from nonconforming vehicles or engines by meeting lower than currently permitted emission standards for vehicles or engines to be built in future model years.

I

Until 1970, the EPA enforced motor vehicle pollution restrictions exclusively by testing engine prototypes for compliance with emission standards. Cf. S.Rep. No. 1196, 91st Cong., 2d Sess. 29 (1970), reprinted in Senate Comm. on Public Works, 93d Cong., 2d Sess. 1 Legislative History of the Clean Air Act Amendments of 1970, 397, 429 (Comm. Print 1974) ("Leg. Hist."). The experience of the 1960s showed that many vehicles in actual use emitted pollutants at levels far in excess of the tested prototypes and that the discrepancy grew as the vehicles' mileage increased. Id. at 29–30, 1 Leg.Hist. 429–30. Proponents of stricter clean air requirements concluded it was essential to "require that new cars meet not only the standards on the production line but also the standards in performance. Unless they do, the whole exercise is useless...." 116 Cong.Rec. 33,093 (1970) (statement of Sen. Muskie). The Clean Air Act Amendments of 1970, Pub.L. No. 91–604, 84 Stat. 1676, addressed this problem by adding § 207, which requires the manufacturer to warrant continuing compliance with emission standards during the vehicle's or engine's

useful life, directs the EPA to test for such compliance (if technologically feasible), and provides for the remedying of noncompliance as described above.

As part of its in-use surveillance program, the EPA tested 1979 General Motors ("GM") cars with GM engine family 920S2E. All ten test vehicles exceeded the NOx emission standard of 2.0 grams per mile, for reasons which neither the EPA nor GM was able to determine. In December 1980, the EPA ordered GM to submit a plan for remedying the nonconformity. In February 1981 GM submitted a proposed remedial plan that called for recall and repair of the nonconforming vehicles. After some discussions with the EPA, GM submitted in May 1981 an alternate plan covering both the 920S2E engine family and the similar 920S4 family which also showed a 100 percent noncompliance rate for NOx. (The latter was under consideration for a noncompliance order by the EPA, though no formal determination of noncompliance had yet been made.) The new plan proposed not recalling and repairing the nonconforming 1979 vehicles[1] but engineering 1982 and 1983 engine families to meet a target lower than mandatory NOx standards. The lower emissions from the 1982–83 vehicles would offset the excessive emissions from the 1979 vehicles. GM asserted that this plan would achieve environmental NOx benefits at least equal to the gain that could theoretically be achieved by a recall if all owners brought in their 1979 vehicles for repair, and far greater than what could realistically be expected given the large number of owners who would in fact not do so. GM claimed that the offset

plan would save the company $11.8 million and would save 1979 vehicle owners $25.8 million in fuel costs, since the repair remedy originally proposed would have caused increased fuel consumption.

After negotiations with the EPA, GM submitted a final revised offset plan on July 2, 1982. The EPA accepted it on July 29, and published a Federal Register notice of this decision on August 30. 47 Fed.Reg. 38,189 (1982). On September 3, 1982 the Center for Auto Safety and others[2] petitioned this court for review of the EPA's decision under 42 U.S.C. § 7607(b)(1) (1982).

## II

Petitioners challenge the EPA's action as unlawful on the ground that the offset plan does not remedy the nonconformity of the 1979 vehicles within the meaning of Section 207(c). Nothing but recall and repair of the nonconforming vehicles themselves, they say, is an acceptable remedy under the statute.

As in every case involving statutory construction, "our starting point must be the language employed by Congress." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979). Section 207(c) provides in relevant part as follows:

> Effective with respect to vehicles and engines manufactured during model years beginning more than 60 days after December 31, 1970—
>
> (1) If the Administrator determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used,

---

1. GM did agree to issue a press release describing the nonconformity and offering, "as a courtesy to [the] ... own[ers]," an ignition system modification that would eliminate the nonconformity—simultaneously noting that the modification would reduce fuel economy by 0.7 miles per gallon. J.A. 62. It has not been contended that this was equivalent to a recall—and the notification by publication was plainly inadequate to comply with § 207(c)(2), 42 U.S.C. § 7541(c)(2). .

2. The other petitioners include two other not-for-profit organizations, Public Citizen, Inc., and

Natural Resources Defense Council, Inc., and three private individuals, one of whom is a member of Congress. The latter three assert that they are "concerned about, and breathe[ ], pollutants in the ambient air" that would be increased by the agency action at issue, Brief for Petitioners at 5; at least these petitioners come within the broad grant of standing announced by the Supreme Court for such cases. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

do not conform to the regulations prescribed under section 7521 of this title, when in actual use throughout their useful life (as determined under section 7521(d) of this title), he shall immediately notify the manufacturer thereof of such nonconformity, and he shall require the manufacturer to submit a plan for remedying the nonconformity of the vehicles or engines with respect to which such notification is given. The plan shall provide that the nonconformity of any such vehicles or engines which are properly used and maintained will be remedied at the expense of the manufacturer. If the manufacturer disagrees with such determination of nonconformity and so advises the Administrator, the Administrator shall afford the manufacturer and other interested persons an opportunity to present their views and evidence in support thereof at a public hearing. Unless, as a result of such hearing the Administrator withdraws such determination of nonconformity, he shall, within 60 days after the completion of such hearing, order the manufacturer to provide prompt notification of such nonconformity in accordance with paragraph (2).

(2) Any notification required by paragraph (1) with respect to any class or category of vehicles or engines shall be given to dealers, ultimate purchasers, and subsequent purchasers (if known) in such manner and containing such information as the Administrator may by regulations require.

42 U.S.C. § 7541(c) (1982). Respondents Ruckelshaus and EPA, as well as Intervenor GM, argue that the variants of the word "remedy" in this provision should be understood in what they assert is the word's "common law" sense, denoting the means by which a right is enforced or the violation of a right is prevented, redressed or compensated. At common law, they argue, substitutionary relief such as compensation is a basic principle of remedies; and absent evidence of a contrary intent, statutory terms with well defined common law content should be given that meaning.

It seems to us that this argument overlooks the basic principle that, in statutes as elsewhere, a word cannot be construed in isolation from its context. If the common-law meaning that a word has acquired is a specialized one, and if the context of the statute is not the context for which that specialized meaning has been assigned, it would distort rather than effectuate legislative intent to disregard ordinary usage. That is the case here. The "substitutionary" connotation of the term "remedy" for which respondents argue is a specialized one. (When speaking of remedying the problem of international terrorism, for example, one would hardly have in mind the provision of adequate monetary compensation for its victims.) And the common-law context of the specialized meaning is judicial relief for private injury. Since the present statute involves executive rather than judicial action, and is addressed to public needs rather than private entitlements, we think the specialized meaning utterly inapt. Absent evidence of contrary intent, the words in the statute must be presumed to bear their normal meaning of eliminating, rather than merely providing compensation for the effects of, the condition that is to be "remedied." Here that means eliminating the nonconformity of the GM vehicles or engines.

Far from contradicting this ordinary meaning, both the surrounding text of the statute and its legislative history tend to confirm it. Paragraph 207(c)(2) requires that notification of nonconformity be provided by the manufacturer to dealers, ultimate purchasers, and (if known) subsequent purchasers. This expensive procedure is categorically required in all cases— yet it would serve no purpose whatever in those cases (if they existed) where offset was to be the relief. There is no point in notifying owners of a nonconformity that will be "remedied" by making changes in a future model. GM evidently realizes this, so its plan did not envision compliance with the notification procedures. *See* note 1, *supra.* How those statutory requirements

could simply be ignored has not been explained.

As for the legislative history: The Senate bill that eventually became the Clean Air Act Amendments of 1970, S. 4358, 91st Cong., 2d Sess. (1970), contained a provision substantially the same as what is before us, requiring the manufacturer to "remedy [the] nonconformity." S. 4358, § 207(e)(3); 1 Leg.Hist. 597. The Senate Committee reporting the bill described this provision as one imposing an obligation "to recall that model or class for the purpose of correcting any nonconformity." S.Rep. No. 1196, *supra*, at 29; 1 Leg.Hist. 429. In the floor debate, Senator McIntyre described the bill as "authorizing the Secretary of Health, Education, and Welfare to have cars road tested and recall those produced if they do not meet standards." 1 Leg. Hist. 389. The House bill did not contain in-use testing provisions. The conference committee "adopt[ed] substantially ... the provisions of the Senate amendment relating to compliance after sale and warranty." Conf.Rep. No. 1783, 91st Cong., 2d Sess. (1970); 1 Leg.Hist. 200. Moreover, a summary of the conference agreement inserted in the Congressional Record by Senator Muskie, leader of the Senate conferees, stated that the "Administrator can test cars on the road, and can require recall if a representative sample fails the test." 1 Leg.Hist. 131.

It is true, as GM forcefully argues in its brief, that all of the statements we have just cited purport to describe merely what the Administrator *may* require and not what he *must* require. But the point is (as GM might more readily appreciate if it were contesting the Administrator's imposition of a "substitutionary" remedy when it would prefer recall) there is *nothing* to suggest that he *may* impose offset. The mere fact that he has discretion in imposing the only remedy discussed that is authorized by the statute in no way implies that he has discretion to impose other remedies as well. Neither GM nor the EPA has been able to refer us to a single passage in the legislative history indicating that Congress had in mind any remedy other than recall when it enacted § 207(c).

GM and EPA argue that in construing statutes courts must accord deference to the interpretation given by the implementing agency. That is true, but the degree of deference is not uniform. A high degree is appropriate, for example, when the agency's expertise can help in assessing the effects of competing interpretations upon the policies of the statute (and hence assessing the interpretation which a wise Congress should be presumed to have intended). *See, e.g., NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 130–31, 64 S.Ct. 851, 860–61, 88 L.Ed. 1170 (1944). That is not the case here; the difference between both the nature and the consequences of recall on the one hand and offset on the other is readily apparent to the uninitiate. A high degree of deference is also called for when the text to be interpreted is a statutory provision that directs an agency to apply "a standard of such inherent imprecision ('closely related to banking') that a discretion of almost legislative scope was necessarily contemplated." *Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System,* 745 F.2d 677, 697 (D.C. Cir.1984). Such a standard is not at issue here. Finally, the degree of deference is also high when the agency presses upon us an administrative construction that is both "contemporaneous" with the statute's enactment (presumably because that is unlikely to have been either informed or coerced by the enacting legislature's genuine intent) and "longstanding" (presumably because, as a matter of stable government, even a minor error regarding the enacting legislature's genuine intent acquires a certain prescriptive right if not corrected by subsequent legislatures). *See Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 120, 100 S.Ct. 2051, 2062, 64 L.Ed.2d 766 (1980). Neither of those conditions is present here. From 1970 until this case, the EPA consistently required recall as the remedy for nonconformity under § 207(c). *See* 47 Fed.Reg. 38,189 (1982). The regulations issued to

implement the section continue to be entitled "Recall Regulations," 40 C.F.R. §§ 85.-1801–85.1807 (1983), and nowhere suggest that any remedy other than recall might be appropriate. Recall has been assumed to be the exclusive remedy even in litigation before this court involving EPA implementation of § 207(c). *See Chrysler Corp. v. EPA*, 631 F.2d 865, 886–87 (D.C.Cir.), *cert. denied*, 449 U.S. 1021, 101 S.Ct. 589, 66 L.Ed.2d 483 (1980).

The degree of deference appropriate here, therefore, is modest—no more than that thoughtful respect we should give to the views of the officers of another branch who have been officially presented with the issue and who, like us, have taken an oath to apply the law that Congress enacted. That is not enough to overcome what seems to us the clarity of the statutory analysis set forth above.

■ We conclude, therefore, that § 207(c) requires recall and repair as the only statutory remedy for nonconformity. Since that is so, the EPA acted unlawfully in proceeding under § 207(c) to accept GM's offset plan as a remedy for the nonconformity—just as it would have acted unlawfully to require it. We emphasize that this is the only issue presented and decided. Specifically, we do not consider the agency's ability to take account of an offset commitment in the exercise of its enforcement discretion, should it decide in a particular case that such a course is "best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically." *Moog Industries, Inc. v. FTC*, 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958). *See Oil, Chemical and Atomic Workers International Union v. Occupational Safety and Health Review Commission*, 671 F.2d 643, 650 (D.C.Cir.1982), *cert. denied sub nom. American Cyanamid Co. v. Oil, Chemical*

*and Atomic Workers International Union*, 459 U.S. 905, 103 S.Ct. 206, 74 L.Ed.2d 165 (1982); *State Water Control Board v. Train*, 559 F.2d 921, 927–28 (4th Cir.1977); *Terminal Freight Handling Co. v. Solien*, 444 F.2d 699, 709 (8th Cir.1971), *cert. denied*, 405 U.S. 996, 92 S.Ct. 1246, 31 L.Ed.2d 465 (1972). That is not what has occurred here, but rather a misinterpretation of the statute which would permit systematic substitution of offsets for recalls. That may well be a more effective means of reducing automotive air pollution; but it was not the means envisioned by the Clean Air Act.

The agency's approval of the GM plan, being not in accordance with law, 5 U.S.C. § 706(2)(A) (1982), is set aside. In light of this disposition, we need not consider the petitioners' motion to complete the record.

*Petition granted.*