**COMMUNITY NUTRITION INSTITUTE, et al., Appellants,**

v.

**Frank YOUNG, Commissioner, Food and Drug Administration.**

**No. 84–5223.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1985.

Decided March 26, 1985.

---

William B. Schultz, with whom Alan B. Morrison, Washington, D.C., was on the brief, for appellants.

Patricia J. Kenney, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., Thomas Scarlett, Chief Counsel, Food and Drug Admin., Stephen D. Terman and Michael M. Landa, Associate Chief Counsel, Food and Drug Admin., Rockville, Md., were on the brief, for appellee.

Philip C. Olsson, Washington, D.C., was on the brief of amicus curiae, the State of S.C., urging affirmance.

Before MIKVA, EDWARDS and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This case presents a challenge to the Food and Drug Administration's regulation of corn adulterated by the presence of aflatoxin. Aflatoxins are by-products of certain common molds that grow on various crops, including corn. The Food and Drug Administration ("FDA" or "agency") permits the shipment of corn containing aflatoxin below an informally adopted "action level." The agency has from time to time granted exemptions to its prescribed action level; moreover, the FDA has permitted blending of adulterated and unadulterated corn to obtain a mixture which the agency believed safe for use as animal feed.

Plaintiffs-appellants, two public interest groups—Community Nutrition Institute and Public Citizen—and an individual consumer (jointly referred to as "CNI"), brought suit in federal district court to require the FDA to adopt, by way of notice-and-comment rulemaking, formal aflatoxin levels or "tolerances," as opposed to informally implemented action levels.[1] Alternatively, CNI argued that, if action levels rather than formally adopted tolerances were permitted, their adoption or amendment and the grant of any exemptions must be treated as rulemakings subject to the procedural requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (1982). Finally, CNI argued that the regulations permitting blending of adulterated and unadulterated corn were contrary to law.

The District Court granted summary judgment in favor of FDA on all three issues. We now reverse with respect to the first issue and hold that, under the plain meaning of the statute, the FDA may not proceed by means of action levels rather than tolerances. By virtue of that disposition, the second issue with respect to the

---

1. Standing was not contested below or on appeal. It is apparently conceded under the broad grant of standing found in the relevant sections of the Food, Drug and Cosmetics Act and the Administrative Procedure Act. *See* 21 U.S.C. § 371(f)(1) (1982); 5 U.S.C. § 702 (1982). *Com-* *pare Block v. Community Nutrition Institute,* —— U.S. ——, 104 S.Ct. 2450, 2454–56, 81 L.Ed.2d 270 (1984) (5 U.S.C. § 702 review is unavailable when the statute relevant to the action precludes review by the class to which plaintiff belongs).

procedures to be employed by the agency in adopting action levels is rendered moot. As to the third issue, the blending of adulterated and unadulterated corn, we vacate that portion of the District Court's judgment and remand for further consideration in light of our holding with respect to the FDA's statutory obligation to promulgate regulations setting forth formal tolerances.

# I

Aflatoxins cause liver damage and exhibit carcinogenic properties in animals; evidence also exists suggesting that their ingestion may cause liver cancer in humans. It is thus undisputed that aflatoxin is a "poisonous or deleterious substance" within the meaning of section 402 of the Food, Drug and Cosmetics Act, 21 U.S.C. § 342 (1982) ("the Act"). Furthermore, since aflatoxin is not an inherent constituent of corn, but results from an environmental or agricultural contaminant,[2] it must be considered an "added" poisonous or deleterious substance within the meaning of the statute.[3]

Since aflatoxin is an "added" substance, it comes within the scope of 21 U.S.C. § 342(a)(2)(A), which provides that "[a] food shall be deemed to be adulterated— ... if it bears or contains any added poisonous or added deleterious substance ... which is unsafe within the meaning of section 346 of this title...." Section 346 in turn provides:

> Any poisonous or deleterious substance added to any food, except where such substance is required in the production thereof or cannot be avoided by good manufacturing practice, shall be deemed to be unsafe ...; *but when such substance is so required or cannot be so avoided, the Secretary shall promulgate regulations limiting the quantity*

*therein or thereon to such extent as he finds necessary for the protection of public health,* and any quantity exceeding the limits so fixed shall also be deemed to be unsafe.... While such a regulation is in effect limiting the quantity of such substance in the case of any food, such food shall not, by reason of bearing or containing any added amount of such substance, be considered to be adulterated.... In determining the quantity of such added substance to be tolerated ... the Secretary shall take into account the extent to which the use of such substance is required or cannot be avoided ... and the other ways in which the consumer may be affected by the same or other poisonous or deleterious substances.

21 U.S.C. § 346 (emphasis added).

Not only is it undisputed that aflatoxin is "poisonous or deleterious" and that it is an "added" substance, but the Secretary also admits facts, *see* Appellee's Brief at 4, sufficient to conclude that the presence of aflatoxin in food may render such consumables injurious to health. Hence, section 342 would, except for the saving grace of section 346, define any aflatoxin-tainted corn to be adulterated, and such corn would therefore be banned from interstate commerce; *see* 21 U.S.C. § 331(a). Nonetheless, since it is also undisputed that aflatoxin is unavoidable, occurring as it does in nature, section 346 may still allow for its interstate transportation. The question before us is what, if any, procedures the Secretary or her delegate, the Commissioner of FDA, is required to follow in invoking the savings provisions of section 346.

The principal point of contention between the parties is over the meaning of that

---

**2.** Weather conditions, insect damage and possibly other factors as well may create conditions that may foster the growth of the molds that produce aflatoxin. *See* Appellee's Brief at 5 n. 2.

**3.** A "naturally occurring poisonous or deleterious substance" is a poisonous or deleterious substance that is an inherent natural constitu-

ent of a food and is not the result of environmental, agricultural, industrial, or other contamination.... An "added poisonous or deleterious substance" is a poisonous or deleterious substance that is not a naturally occurring poisonous or deleterious substance. * * * *
21 C.F.R. §§ 509.4(c), (d) (1984).

portion of the statutory provision, highlighted in the text above, which reads: "[B]ut when such substance ... cannot be so avoided, the Secretary shall promulgate regulations limiting the quantity therein or thereon to such extent as he finds necessary for the protection of public health...." Emphasizing the word "shall," CNI argues that the Secretary is statutorily obligated to issue regulations embodying a tolerance for the substance before the product may lawfully be introduced into interstate commerce. The Commissioner, on the other hand, maintains that this provision merely *authorizes* FDA to issue tolerances but that the agency may, alternatively, elect to proceed by means of informal action levels indicating the levels of contamination below which the FDA will exercise its enforcement discretion, provided under 21 U.S.C. § 336,[4] not to take action. We are thus required to divine the intent of Congress with respect to FDA's authority in this respect under the Act.

## II

■ In questions of statutory construction, our initial inquiry must be, as this court has recently stated, to "determine whether Congress 'has directly spoken to the precise question at issue.'" *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1566 (D.C.Cir.1984) (*en banc*) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, ── U.S. ──, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). In that process, "reviewing courts ... must not 'rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority*, 464 U.S. 89, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988–89 (1965)). *See also Chevron, supra,*

104 S.Ct. at 2781–82, ("If the intent of Congress is clear ... the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

After careful review, we find that Congress has spoken on the issue in question and that the intent of Congress is abundantly clear in requiring the formal issuance of tolerances, rather than permitting agency reliance solely on informal action levels. The interpretation accorded the Act by the FDA flies in the teeth of Congress' clear intent and, under long established principles of administrative law, must therefore be rejected.

### A

■ Our analysis begins, of course, by turning to the language of the statute itself. *See, e.g., Consumer Product Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("the starting point for interpreting a statute is the language of the statute itself"); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979) ("our starting point must be the language employed by Congress"); *Center for Auto Safety v. Ruckelshaus*, 747 F.2d 1, 3 (D.C.Cir.1984) (same, quoting *Reiter*). The presence of the critical word "shall" plainly suggests a directive to the Secretary to establish a tolerance, if a food with an unavoidable poisonous or deleterious substance is to be considered unadulterated. The FDA's response to this common-sense reading is to point to the statutory phrase, "to such extent as [the Secretary] finds necessary for the protection of public health." The FDA contends that this phrase modifies the word "shall," and that the agency's decision to proceed by action levels rather than tolerances properly lies within the FDA's broad discretion. Under this view, the Commissioner may simply conclude that establishing a tolerance is not necessary for

---

4. "Nothing in this chapter shall be construed as requiring the Secretary to report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this chapter

whenever he believes that the public interest will be adequately served by a suitable written notice or warning." 21 U.S.C. § 336.

the protection of public health and, so the FDA argues, the agency may thus proceed by informal action levels.

It is, however, clear from the structure of the sentence at issue here that the phrase relied upon by the Secretary simply does not modify the pivotal word "shall." Rather, the qualifying phrase serves an entirely different office; it explains the standard that the Secretary is to employ in setting the tolerance. The Secretary must promulgate regulations embodying tolerances, but the level above which food is taken to be adulterated is to be that which the agency "finds necessary for the protection of public health."

This conclusion is supported by the overall structure of the statutory section in question. Section 346 first provides any poisonous or deleterious substances added to any food are deemed to be unsafe; however, an exemption is also built in to the opening provisions of section 346. Specifically, the statute exempts foods containing *unavoidable* adulterants. But the language does not stop there; the provision then states that the Secretary "shall" promulgate regulations (*i.e.*, set tolerances) limiting the quantity of the substance. Further, the section provides that, when a regulation establishing a tolerance is in effect, such food will not be considered adulterated. Since the existence of a regulation operates to render the food legally unadulterated, the statute, in our view, plainly requires the establishment by regulation of tolerances before aflatoxin-tainted corn may lawfully be shipped in interstate commerce.

In arguing, quite correctly, that language must be treated in context, the FDA urges us to look to section 336 of the Act. *See supra* note 4. There, the agency divines a grant of discretion not to establish tolerances yet to allow the shipment of corn below the prescribed action level. The FDA argues that this section thus allows it to issue action levels standardizing the exercise of prosecutorial discretion.

The language of section 336 does lend modest support to FDA's position: "Nothing in this chapter shall be construed as requiring the Secretary to report for prosecution, or for the institution of libel or injunctive proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or warning." 21 U.S.C. § 336. However, the prosecutorial discretion for which the FDA argues here does not appear to be that envisioned by this particular provision of the statute. Section 336, in effect, requires the Secretary to issue a written notice or warning in instances in which the agency decides not to take some form of enforcement action. That section does not, however, allow the shipment of aflatoxin-tainted corn without the establishment of a tolerance. Rather, it clearly vests the agency with discretion to decline to prosecute someone who exceeds the tolerance, even if the tolerance is zero, if the FDA determines that a written notice or warning will be adequate to protect the public interest.

### B

The language of the statute clearly requires the issuance of formal regulations or tolerances.[5] While, as both parties in-

---

**5.** FDA does not, or could it, argue that adhering to the plain language of the statute would lead to an irrational result or have effects destructive of the policy considerations that informed the enactment of the legislation in the first instance. *Compare, e.g., Commissioner v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) (courts have some scope to reject a common or literal meaning " 'where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute' ") (quoting *Helvering v. Hammel,* 311 U.S. 504, 510–11, 61 S.Ct. 368, 371–72, 85

L.Ed.2d 303 (1941)). Instead, the agency argues that requiring full-blown notice-and-comment procedures would be highly burdensome and unduly time-consuming for a regulatory entity which is plagued with limited resources. We are not unmindful of those concerns, but it is simply not our place to do anything about them. Those concerns, rather, are best addressed within the political branches, not the courts. Our task is to interpret the law. We cannot carry out that function in a principled manner by reading the statute with a perspective driven by

vite us to do, we will consider the legislative history, "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc., supra,* 447 U.S. at 108, 100 S.Ct. at 2056. Upon analysis, we find little guidance in the legislative history and certainly not the clear intention necessary to counter the expression of clear language of the statute.

As is usually the case, both sides have emerged from their respective digs into the history of this legislation pointing to historical items supportive of their respective theories. CNI claims support for its position from the fact that, while the Senate version of the bill *authorized* the Secretary to issue tolerances, a subcommittee of the House Interstate and Foreign Commerce Committee changed the language to provide that the Secretary *shall* promulgate tolerances. FDA does not quarrel with this find unearthed by CNI, but asserts that no conclusion of moment should be drawn from the fact of this change. Indeed, as is not infrequently the case in the precincts of legislative history, the subcommittee did not explain, in the committee print, its reasons, if any, for modifying the language in this respect. *See House Committee on Interstate and Foreign Commerce, 75th Cong., 1st Sess., Committee Print No. 3* (August 19, 1937), *reprinted in* 81 Cong.Rec. (Appendix) 2341, 2344 (August 21, 1937).

For its part, the FDA observes that, when the full House Commerce Committee reported on the Act, the section in question was described in the following way: "This subsection first prohibits the unnecessary addition of poisons. Where such additions are necessary, the establishment of tolerances is *authorized,* based upon the practical necessities for the use of poisonous substances." *See* H.R.Rep. No. 2139, 75th Cong., 3d Sess. at 6 (1938) (emphasis added). Thus, agency "authority" to issue tolerances, as opposed to a statutory *obliga-*

the exigencies of agency resources or the lack

*tion* to do so, is seen by FDA as having been provided for by the Act.

Where we are left at the end of the day with respect to the House Report is that the House Report is, at bottom, consistent with either side's position. To be sure, as FDA emphasizes, the Report does state that the Secretary has *authority* to promulgate regulations, and this formulation indeed suggests a grant of discretionary authority. However, when this portion is read in context—as FDA earnestly urges us to do in parsing the statutory language itself—the Report in pertinent part first observes the existence of a ban on adulterated foods and then goes on to say that tolerances are authorized. The indication is that, without the tolerance, shipment of the food would not be allowed. *See id.* at 2 ("The addition of poisons to foods is prohibited except where such addition is necessary or cannot be avoided; *and in such cases tolerances are provided limiting the amount of added poisons* to the extent necessary to safeguard the public health.") (emphasis added). In a word, while the agency has authority to issue tolerances, the Report does not say that it has authority to allow the shipment of adulterated food without issuing such tolerances.

The language of the earlier Senate Report accompanying S. 5, which was the bill considered by the committee in House Report No. 2139, is infected with the same ambiguity. It prohibits poisonous or deleterious substances and then authorizes the establishment of tolerances. In contrast to the House bill, however, this earlier Senate bill would have established a Presidentially-appointed committee to advise the Secretary in setting tolerances. That measure also provided that the Committee's recommendation would be the subject of a hearing, after which the regulation could be promulgated. The approval of a majority of the committee was required for any such regulation. *See* S.Rep. No. 646, 74th Cong., 1st Sess. 3 (1935). Since this provision changed before enactment, the Report of course is not entitled to much weight.

thereof.

It does, however, indicate that the Senate had expected a far more elaborate procedure than that argued for here by FDA.

### C

Beyond these nooks and crannies of legislative history, the FDA argues that ample case law on the very question before us supports the agency's position. We find, however, that the authorities invoked by FDA are decidedly inapposite. For example, the FDA relies upon *United States v. Boston Farm Center, Inc.*, 590 F.2d 149 (5th Cir.1979), as support for its position that the agency may, but is not required to, issue tolerances. That case indeed observes that "[i]n implementing the Act, the FDA either may adopt formal regulations ... or may litigate alleged violations on a case-by-case basis." *Id.* at 151 (citation omitted) (noting also the discretion granted by section 336). However, *Boston Farm Center* is, in respect of the issue before us, a horse of an entirely different color, namely a suit by the United States to halt distribution of aflatoxin-tainted corn. Boston Farm Center, an enterprise situated not in New England but in Georgia, claimed in defending against an enforcement action that FDA could not halt distribution without first having issued a tolerance. Since evidence existed that aflatoxin was an adulterant and that at the level there present the tainted corn was unsafe, the court held that the FDA could take action in such an individual case, without establishing a rule for all cases. The agency's authority at issue there was the entirely different one of power to enjoin shipment.

The same is true of *United States v. Anderson Seafoods, Inc.*, 447 F.Supp. 1151 (N.D.Fla.1978), *aff'd*, 622 F.2d 157 (5th Cir. 1980), another authority invoked by the Commissioner. In that case, the district court ruled that the item in question there (swordfish) was safe but also found without merit the defendant's contention that the FDA was required to establish a tolerance. *See id.* at 1153 n. 2. Here again, it was the United States taking enforcement action, with the defendant claiming that its product could not be prohibited without the FDA's first establishing a tolerance. And, as in *Boston Farm Center*, the ability of the United States to prohibit shipment of food without having first established a tolerance simply does not, in our view, speak to the agency's refusal to establish a tolerance while permitting shipment.

*United States v. Goodman*, 353 F.Supp. 250 (E.D.Wisc.1972), *aff'd*, 486 F.2d 847 (7th Cir.1973), and *aff'd sub nom. U.S. v. Ewig Bros. Co.*, 502 F.2d 715 (7th Cir.1974), *cert. denied sub nom. Vita Food Products v. U.S.*, 420 U.S. 945, 95 S.Ct. 1324, 43 L.Ed.2d 423 (1975), spoke more directly to this point. As in the two cases already discussed, a defendant-shipper had claimed that the FDA could not proceed against him without first establishing a tolerance. The court stated:

> [A]lthough the provisions of subsection (b) [of section 346a, a similarly worded section for the establishment of tolerances,] would seem, facially, to suggest a duty to promulgate regulations that contain tolerances, I am persuaded that the total statutory scheme contemplates a judicial obligation to enjoin the distribution of unsafe foods even in the absence of a formally promulgated regulation.

*Id.* at 251. The court thus recognized the narrowly limited scope of the question it was deciding and entered an injunction against the challenged shipment notwithstanding the absence of established tolerances. The court said nothing as to permission to ship without the establishment of tolerances.

Other cases cited by the FDA likewise involved these familiar refrains by defendants in enforcement proceedings that they could not be enjoined from shipping adulterated food absent the FDA's prior establishment of tolerances. The courts in those cases also held that case-by-case adjudication was allowable, but they did not speak to the precise issue in contention here. *See United States v. General Foods Corp.*, 446 F.Supp. 740, 745 (N.D.N.Y.) (also noting that "Congress has apparently mandated that the F.D.A. establish tolerances for poi-

sonous or deleterious substances which are required or unavoidable in the production of food, such regulations relating to adulteration under [21 U.S.C. § 342(a)(2) ], see 21 U.S.C. § 346" but that there was no such requirement under the subsection at issue in that case), *aff'd*, 591 F.2d 1332 (2d Cir.1978); *Certified Color Industry Committee v. Secretary of Health, Education and Welfare*, 236 F.2d 866 (2d Cir.1956) (defendant could not require tolerance before action taken against it).[6]

The State of South Carolina, as *amicus curiae* in support of the FDA, presents a separate argument based upon two Supreme Court cases. In *United States v. Lexington Mill & Elevator Co.*, 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914), the Court had held that, under the 1906 version of the Act, the simple existence of a deleterious or poisonous substance did not make a product adulterated. Rather, a requirement existed that the substance must be present in such quantity that it might render the product injurious to health. In *Flemming v. Florida Citrus Exchange*, 358 U.S. 153, 161, 79 S.Ct. 160, 165, 3 L.Ed.2d 188 (1958), the Court held that the rule in *Lexington Mill* still applied to section 402(a)(1) of the 1938 Act, 21 U.S.C. § 342(a)(1). From these two cases, South Carolina concludes that to interpret the law so as to require the existence of tolerances—before shipment is allowed—would be

to bar shipment of food containing *de minimus* or harmless traces of poisonous or deleterious substances in violation of *Lexington Mill.*

However, the 1906 and 1938 Acts differ significantly in this area. While the 1906 Act contained a section similar to section 402(a)(1) of the 1938 Act, 21 U.S.C. § 342(a)(1), it did not contain a section equivalent to section 402(a)(2) of the 1938 Act, 21 U.S.C. § 342(a)(2). *See* 34 Stat. 768, 769–70 (1906). It is the latter provision, 21 U.S.C. § 342(a)(2)(A), that defines as "adulterated" food which is unsafe within the meaning of 21 U.S.C. § 346; *Lexington Mill* and *Flemming* thus do not speak to the issue at hand. Any relevance those cases might have is further diminished by the fact that they likewise involved enforcement actions by the United States against producers or distributors; they do not address the FDA's authority *vel non* to allow shipment of adulterated foods without the establishment of tolerances.

### III

Since we have concluded that the FDA is required to issue regulations establishing tolerances in order for food containing unavoidable added poisonous or deleterious substances to be considered unadulterated for the purposes of 21 U.S.C. § 342(a)(1) or unsafe for purposes of 21 U.S.C.

---

**6.** The FDA finds further support for the proposition that "shall" does not mean "required" in *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), and *United States v. Morgan*, 222 U.S. 274, 32 S.Ct. 81, 56 L.Ed. 198 (1911). However, an examination of the cases shows that they fail to support the FDA's position here. In *Dotterweich*, the defendant invoked section 305 of the Act, which read: "Before any violation of this chapter is reported by the Administrator to any United States Attorney for institution of a criminal proceeding, the person against whom such proceeding is contemplated shall be given appropriate notice and an opportunity to present his views, either orally or in writing, with regard to such contemplated proceedings." *See United States v. Buffalo Pharmacal Co.*, 131 F.2d 500, 502 n. 3 (2d Cir. 1942), *rev'd sub nom. United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). The Supreme Court "agree[d] with the Circuit Court of Appeals that the giving of such

an opportunity, which was not accorded to Dotterweich, is not a prerequisite to prosecution." *Dotterweich, supra*, 320 U.S. at 279, 64 S.Ct. at 279. Turning to the Court of Appeals opinion in that case, we find the appellate court agreeing with the district court's ruling that "the provision for notice and a hearing was an administrative direction to the Administrator rather than a jurisdictional requirement for criminal proceedings." *Buffalo Pharmacal, supra,* 131 F.2d at 502. The case simply does not stand for the proposition that "shall" can be read as "may." To the contrary, "shall" indicated to a singularly distinguished panel of the Second Circuit (L. Hand, Swan, and Chase, JJ.) nothing less than an "administrative *direction.*" The court merely concluded that failure to follow that direction did not result in a loss of criminal jurisdiction. *Morgan,* based on the 1906 version of the Act, similarly held that a provision that "notice shall be given" was not a jurisdictional requirement.

§ 342(a)(2)(A), we need not consider the second issue on appeal. Appellants' argument that the establishment of action levels, and the amendment of and grant of exemptions thereto, were rulemakings within the meaning of the APA is rendered moot by our determination as set forth above.

Finally, appellants maintained below that the FDA's approval of blending of aflatoxin-contaminated corn was likewise violative of the Act. The District Court rejected this challenge on the ground that the agency could properly proceed by action levels and could then grant exemptions to these levels. Inasmuch as the District Court's rationale in this respect was premised upon a statutory interpretation that we are constrained to conclude was in error, we vacate as well that portion of the District Court's judgment and remand for further consideration in light of the duty incumbent on the FDA to promulgate regulations setting forth formal tolerances, as well as appellants' further specific arguments advanced in this respect.

*It is so ordered.*