**NATIONAL WILDLIFE FEDERATION, Petitioner,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Food and Drug Administration, Respondents.**

**No. 85–3943.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 3, 1986.

Decided Dec. 23, 1986.

Mark Van Putten, National Wildlife Federation, Ann Arbor, Mich., for petitioner.

Marcia A. Johnson, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, D.C., for respondents.

Before KENNEDY and MILBURN, Circuit Judges, and BROWN, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

The National Wildlife Federation ("NWF") challenges the U.S. Food and Drug Administration's ("FDA") refusal to issue an interim action level or tolerance setting acceptable levels of dioxin contamination for human consumption of fish and other food pursuant to the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–392 (1982) ("FDCA"). Because we conclude that FDA's decision not to issue an interim level or tolerance is in accordance with law, we affirm.

On January 20, 1984, NWF filed an administrative petition with FDA requesting, *inter alia*,[1] that FDA promulgate an interim action level and establish a tolerance for dioxin in fish and other food under section 346 of the FDCA.[2] Section 346 of the FDCA provides that if a poisonous or deleterious substance has been unavoidably added to food, the Secretary shall "promulgate regulations limiting the quantity therein or thereon to such extent as he finds necessary for the protection of public health, and any quantity exceeding the limits so fixed shall also be deemed to be unsafe...." 21 U.S.C. § 346.[3]

Although FDA issued an advisory standard for consumption of dioxin contaminated Great Lakes fish,[4] NWF contended that FDA did not have adequate data to support this advisory, and that dioxin contamination is an interstate problem requiring an interim action level and a tolerance. Additionally, NWF contended that FDA erroneously took the position that an action level and tolerance were unnecessary because dioxin contaminated sports fish did not present an interstate problem. In support of this contention, NWF quoted a statement made by Dr. Albert Kolbye of FDA in an August 17, 1981 telephone conference call between Dr. Kolbye and representatives of the Michigan Departments of Public Health and Natural Resources. Dr. Kolbye stated:

> But we don't think there is an interstate regulatory problem from FDA's viewpoint. Our concern is really to share with you our information on the highest risk situation that is likely to be in tolerance in a space controlled situation where local people are systematically fishing in a particular body of water and catching bullheads or what have you and eating them on a regular basis. That is not something that we can really control from the Federal viewpoint nor should we be involved.

*See* Joint Appendix at 52.

On August 14, 1985, FDA issued an order denying NWF's petition, concluding

1. The petition also requested FDA to adopt a nonthreshold-based risk assessment model that is linear at low doses, and consider dioxin as a direct acting carcinogen. NWF did not request this Court to review these issues.

2. The petition requested a five parts-per-trillion ("ppt") interim action level and a tolerance based on a one in a million lifetime cancer risk. The Health Research Group also submitted a petition to FDA requesting this action. FDA denied this petition, but Health Research did not seek review.

3. While a regulation is in effect, section 346 provides that food containing such a substance is not adulterated. Section 371(e) sets forth the procedures for establishing these regulations, referred to as tolerances, and provides that FDA may commence such proceedings on its own initiative, or on petition of any interested person showing reasonable grounds for the requested tolerance. Section 371(e) also provides that FDA must publish the proposed tolerance for public comment, and issue a final rule to which objections and requests for a formal trial-type hearing can be filed.

4. The advisory, which is without legal effect, recommends that if the dioxin levels found in fish average less than 25 ppt, there is little cause for concern. If the dioxin concentration ranges from 25 to 50 ppt, the state should advise sport fishermen who consume such fish only a few times a year to restrict consumption of such fish to no more than once a week, and permanent residents who consume fish throughout the year to restrict their intake to no more than 1–2 times per month. Finally, if the dioxin concentration exceeds 50 ppt, the advisory recommends that the state limit the taking of fish from the affected areas.

that NWF had failed to present reasonable grounds justifying the promulgation of an interim action level or tolerance.[5] FDA stated that it reviewed all the current data on dioxin and was convinced that the risk to the general population was not significant; thus a federal tolerance or action level was unnecessary. According to FDA, the studies revealed that dioxin contaminated fish were found only in limited areas of the Great Lakes. Furthermore, FDA concluded that most Americans do not consume Great Lakes fish frequently,[6] and that a tolerance would not protect Great Lakes sports fishermen, the population at greatest risk.[7] Its conclusion was based on the following factors: (1) the area of fish contamination is limited to only a part of the Great Lakes; (2) the species of fish most likely to contain dioxin constitute only a small portion of the fish in interstate commerce; (3) only consumers, such as sports fishermen, who consistently eat fish from contaminated areas, are at significant risk, and a tolerance would not apply to such fish; and (4) FDA's findings indicate that although dioxin is unavoidable, the levels of dioxin in the fish most likely to contain this chemical have been decreasing in recent years.

In its petition to this Court,[8] NWF alleges that FDA refused to promulgate a tolerance or action level because it had mistakenly concluded it did not have jurisdiction to protect the public health from the admitted risks posed by consuming dioxin contaminated Great Lakes sports fish. NWF contends that FDA, therefore, erroneously considered only the risks of consuming dioxin contaminated commercially marketed fish, and did not consider the risks posed by consuming contaminated sports fish,[9] the fish with significantly higher concentrations of dioxin.[10] NWF also alleges that FDA's conclusion that it does not have jurisdiction to regulate the consumption of these fish is contrary to the Supreme Court's interpretation of the commerce clause, and the language, legislative history, and judicial interpretation of the FDCA. Accordingly, NWF asserts that FDA's denial of its petition was "not in accordance with law," within the meaning of 21 U.S.C. § 371(f)(3). Finally, NWF contends that this error "fatally infected" FDA's analysis of the data presented in the petition insofar as FDA considered only the health risks posed by consuming commercially market-

5. FDA denied the request for a tolerance and an interim action level on the same grounds. It did, however, state that it would continue to monitor foods for the presence of dioxin, and left open the possibility that a tolerance or interim action level could be appropriate in the future.

6. FDA stated that of the fish consumed by Americans, less than 10% is freshwater fish and only a small portion of freshwater fish consumed is from species that are likely to contain dioxin.

7. FDA concluded that a tolerance would regulate only fish in interstate commerce, and that the advisory provided state agencies, the agencies with jurisdiction over sport fisheries, with information needed to control this exposure.

8. NWF's request that this Court order FDA to establish an interim action level and commence a tolerance setting process was based largely on *Community Nutrition Institute v. Young*, 757 F.2d 354 (D.C. Cir.1985), *rev'd*, — U.S. ——, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986). The Supreme Court, however, rejected the District of Columbia Circuit's reading of section 346 and conclud-

ed that even if a poisonous or deleterious substance has been added to a food, and the contamination is unavoidable, section 346 allows, but does not require, FDA to set interim action levels or tolerances. 106 S.Ct. at 2365. NWF filed a supplemental brief after the Supreme Court's opinion in *Community Nutrition* and conceded that its request that this Court order FDA to promulgate an interim action level and commence a tolerance setting process was no longer valid.

9. NWF contends that FDA's denial was "explicitly premised on FDA's incorrect assumption that it had no FDCA jurisdiction over dioxin-contaminated sports fish." Supplemental Brief for Petitioner at 3.

10. NWF asserts that the FDCA requires FDA to promulgate an interim action level and tolerance based upon the risks posed by the consumption of Great Lakes sports fish. Had FDA considered the risks posed by these fish, NWF contends that it would have promulgated such an action level and tolerance.

ed fish.[11] Thus, NWF asserts that FDA's decision was not supported by substantial evidence. Because of these errors, NWF requests this Court to remand the petition to FDA for reconsideration of whether the health risks to consumers of these sports fish warrant the issuance of an action level or tolerance.

FDA contends that it has exercised its discretion not to promulgate a tolerance based upon its findings that such action is not necessary to protect the public health. It points out that the agency considered all relevant factors and data including the risk posed by consuming Great Lakes sports fish. It notes that the letter denying the petition states that less than ten percent of the fish eaten by U.S. consumers is freshwater fish and only a fraction of the freshwater fish consumed is from species likely to contain dioxin residues. Additionally, FDA argues that NWF misconstrued the statements regarding FDA's jurisdiction in the letter denying the petition. FDA states that although it has jurisdiction to set a tolerance for dioxin contaminated sports fish, the tolerance would not effectively protect sports fishermen because FDA does not have the regulatory resources to control the consumption of sports fish. Finally, FDA contends that its decision regarding enforcement of a tolerance or action level cannot be challenged. *See Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

■■■ Section 371(f)(3) of the FDCA requires this Court to determine whether FDA's decision is in accordance with law and, as to the facts, whether it is supported by substantial evidence.[12] An examination of FDA's letter denying the petition reveals that FDA considered the relevant animal and human exposure data, including the risks posed by the consumption of dioxin contaminated Great Lakes sports fish, and decided that a tolerance and interim action level were inappropriate. Thus, NWF's statement that FDA's denial was explicitly premised upon FDA's incorrect assumption that it had no jurisdiction over the contamination of sports fish is inaccurate. FDA used data collected by the National Marine Fisheries Service and calculated, based upon the more than 17 million individuals in the Great Lakes states expected to consume the species analyzed for dioxin residues, the daily amount of dioxin consumed. FDA then determined the risks of cancer from such exposure and found that the advisory adequately protected these consumers and that a nation-wide tolerance and action level were not necessary to effectively control this problem.[13] Thus, FDA concluded that the consumption of Great Lakes sports fish would not result in significant dioxin exposure to the general population. FDA clearly has the discretion not to issue a tolerance even if a deleterious or poisonous substance has been added to food, and the contamination is unavoidable. *Young v. Community Nutrition Institute,* —— U.S. ——, 106 S.Ct. 2360, 90 L.Ed.2d 959. Thus, it is within FDA's discretion not to issue a tolerance or action level.

Accordingly, because FDA's decision is in accordance with law and supported by substantial evidence, we affirm.

---

**11.** FDA admitted that only sports fishermen and consumers who catch and consistently eat fish from contaminated areas are "at significant risk." *See* Joint Appendix at 105.

**12.** Section 371(f)(3) provides:
Upon the filing of the petition [with the United States Court of Appeals], the court shall have jurisdiction to affirm the order, or to set it aside in whole or in part, temporarily or permanently. If the order of the Secretary refuses to issue, amend, or repeal a regulation and such order is not in accordance with law the court shall by its judgment order the Secretary to take action, with respect to such regulation, in accordance with law. The findings of the Secretary as to facts, if supported by substantial evidence, shall be conclusive. 21 U.S.C. § 371(f)(3).

**13.** As discussed above, FDA considered the relatively insignificant amount of freshwater fish consumed by the nation and the fact that the species of freshwater fish likely to be contaminated (carp, catfish and other bottom feeders) make up only a small fraction of the freshwater fish consumed. Additionally, FDA found that dioxin residues in fish appears to be a problem in only limited areas of the Great Lakes.