**SOUTHERN UNION GAS COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

City of Willcox, Arizona, Southern California Gas Co., ASARCO, Inc., et al., Gas Co. of New Mexico, El Paso Municipal Customer Group, El Paso Natural Gas Co., Pacific Gas and Electric Co., Southwest Gas Corp., Apache Powder Co., et al., The Public Utilities Commission of the State of California, Intervenors.

**SOUTHWEST GAS CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

ASARCO, Inc., et al., Gas Co. of New Mexico, El Paso Municipal Customer Group, City of Willcox, Arizona, et al., El Paso Natural Gas Co., Apache Powder Co., et al., The Public Utilities Commission of the State of California, Southern California Gas Co., Intervenors.

Nos. 87–1085, 87–1095.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 5, 1988.

Decided March 8, 1988.

Douglas M. Canter, with whom William I. Harkaway and Robert J. Haggerty were on the joint brief, for Southern Union Gas Co. and Southwest Gas Corp. Richard D. Fortin, Washington, D.C., also entered an appearance for petitioner, Southern Union Gas Co. in No. 87–1085.

Samuel Soopper, F.E.R.C., with whom Catherine C. Cook, General Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent. Joel M. Cockrell, F.E.R.C. also entered an appearance for respondent.

Michael B. Day, with whom J. Calvin Simpson for Public Utilities Com'n of the State of California, Steven F. Greenwald, and Lindsey Now–Downing for Pacific Gas and Elec. Co., E.R. Island and Douglas Porter for Southern California Gas Co. were on the joint brief, for intervenors, Public Utilities Com'n of the State of California, et al. Howard V. Golub also entered an appearance for intervenor, Pacific Gas and Elec. Co. in No. 87–1085.

Howard L. Nelson and Arnold D. Berkeley were on the brief for intervenors, Arizona Elec. Power Co-op., Inc., and the City of Willcox, Ariz.

Nicholas W. Fels entered an appearance for intervenor, ASARCO, Inc., et al.

John T. Stough, Jr. entered an appearance for intervenor, Gas Co. of New Mexico.

Susan N. Kelly entered an appearance for intervenor, El Paso Municipal Customer Group.

Donald J. MacIver, Jr., Richard Owen Baisch, Michael D. Ferguson and Richard C. Green entered appearances for intervenor, El Paso Natural Gas Co. Scott D. Fobes also entered an appearance for intervenor, El Paso Natural Gas Co. in No. 87–1085.

Joel L. Greene and Barbara S. Jost entered appearances for intervenor, Apache Powder Co., et al.

Before WALD, Chief Judge, STARR, Circuit Judge, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This is a challenge to the Federal Energy Regulatory Commission's denial of a request by two gas distribution companies to investigate the reasonableness of a gas curtailment plan entered into pursuant to a settlement agreement approved by the Commission seven years ago. The argument is that the regulatory environment has so dramatically changed since the agreement received FERC's approbation at the dawn of the decade that the Commission is duty bound to initiate an investiga-

tion into the present effects of the settlement-mandated plan. For the reasons that follow, we deny the petitions for review.

I

The background of acute and chronic shortages of natural gas in the 1970s has frequently been chronicled and need not be repeated here. *See, e.g., Wisconsin Gas Co. v. FERC*, 770 F.2d 1144, 1149–52 (D.C. Cir.1985), *cert. denied*, 476 U.S. 1114, 106 S.Ct. 1969, 90 L.Ed.2d 653 (1986); S. BREYER, REGULATION AND ITS REFORM 244–53 (1982). Suffice it to say that considerable litigation was spawned during the course of that decade over gas curtailments imposed by the El Paso Natural Gas Company, a large pipeline that services customers (including petitioners) in the Great Southwest and California. Faced with the prospect of long-lived litigation continuing on into the 1980s, petitioners, along with El Paso and various other interested parties (including El Paso's two large California

customers, Southern California Gas Co. and Pacific Gas & Electric Co.), entered into a settlement agreement in 1980. For our purposes, the salient point of the settlement was that El Paso committed to stand ready to supply the two California behemoths in conformity with their fixed end use profiles,[1] as elucidated in a technical and complex set of provisions in the plan. Employment of the profiles was chosen as the contractual benchmark instead of the California customers' total maximum contract daily demands (MCDDs).[2] Those levels had, over time, been reduced to zero. The practical effect of the curtailment plan was to impose on El Paso an obligation to exercise "reasonable diligence" to have ample gas supplies on hand to meet the California customers' demand profiles.

In the wake of a dramatic shift in the market from acute gas shortages to continuing surpluses, and FERC's restructuring of the natural gas regulatory regime,[3]

---

**1.** Pursuant to the settlement, El Paso relies on annual day end use profiles to allocate its available gas among its three main categories of customers (in the event that a curtailment situation arises). The categories include the two California customers, East-of-California customers which purchase less than 1 million Mcf annually from El Paso, and (like petitioners in this case) East-of-California customers which purchase more than 1 million Mcf annually from the pipeline. A customer's daily profile is determined by El Paso's original service obligation to that customer, as provided for in its service agreement with the pipeline. Under the settlement, available gas supplies are used to satisfy the profiles of each category of customers on the basis of their priority *vis-a-vis* the other categories of customers (as set forth in the settlement) and on a pro rata basis within categories. Each customer's fixed end use profile is set without reference to its actual (current) daily contract demands.

**2.** "MCDDs" are the levels of gas, set in a customer's service agreement with the pipeline, which the pipeline agrees to supply and the customer agrees to purchase. The service agreements of the California customers provided for MCDDs to diminish over time; from a 1972 level of 2,890,000 Mcf, their MCDDs were reduced to zero by 1986. As we noted above, *see supra* n. 1, the curtailment plan determined the end use profiles on the basis of daily demand levels set in a customer's *original* service agreement rather than on the basis of current MCDDs. The California customers thus currently have an available daily supply of natural gas (based on

the levels of their original service agreements) while incurring no obligation to purchase any of the available gas (because their contractually set MCDD obligations have, over time, disappeared).

**3.** As has been well chronicled elsewhere, FERC in recent years has undertaken a dramatic restructuring of the natural gas industry. Order No. 380, requiring that interstate pipelines eliminate variable costs from minimum commodity bills, has resulted in pipelines being unable to deter partial requirements customers from purchasing gas in a competitive fashion. *See Elimination of Variable Costs from Certain Natural Gas Pipeline Minimum Commodity Bill Provisions*, F.E.R.C. Stats. & Regs. (CCH) (Preambles 1982–85) ¶ 30,571 (1984), *aff'd in part, Wisconsin Gas Co. v. FERC*, 770 F.2d 1144 (D.C.Cir. 1985), *cert. denied*, 476 U.S. 1114, 106 S.Ct. 1969, 90 L.Ed.2d 653 (1986). Order No. 436, requiring interstate pipelines to transport gas on a nondiscriminatory basis, is intended to further enhance the new competitive environment in the industry. *See Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, F.E.R.C. Stats. & Regs. (CCH) (Preambles 1982–85) ¶ 30,665 (1985), *vacated, Associated Gas Distrib. v. FERC*, 824 F.2d 981 (D.C.Cir.1987), *petition for cert. filed*, 56 U.S.L.W. 3462 (U.S. Dec. 14, 1987) (Nos. 87–976, *et al.*). For exhaustive discussions, complete with comprehensible explanations, of the intricacies of these orders, see *Wisconsin Gas and Associated Gas Distributors*.

petitioners, two of El Paso's so-called "East-of-California" customers, came to the view that the upshot of these fundamental changes was to require El Paso to have on hand (and therefore contract to purchase) excessive amounts of gas for what was in reality a "phantom market" in California. As petitioners gloomily viewed the situation, Southern California Gas and Pacific Gas & Electric found themselves blessed with a readily available, plentiful supply of gas from El Paso which they had no firm obligation to purchase; moreover, as a result of various regulatory changes (especially Order No. 380, see supra n. 3), the California customers were able to obtain, at will, gas from other suppliers (a practice colorfully known in the industry as "swinging.") In petitioners' view, FERC had enhanced swinging opportunities in a series of orders permitting Canadian affiliates of the two California customers to supply them gas at what proved to be attractive prices. See Northwest Alaskan Pipeline Co., 29 F.E.R.C. (CCH) ¶ 61,199 (1984), reh'g denied, 30 F.E.R.C. (CCH) ¶ 61,126 (1985). Petitioners feared that El Paso's purchases for the "phantom market" could result in burdensome "take or pay" contract liabilities to producers, which would in turn be passed on to the hapless East-of-California customers.[4] This unfortunate situation was exacerbated by regulatory shifts that worked a partial transformation of interstate pipeline systems from purely "gas merchant" roles to that of providers of transportation for natural gas purchased from others. See supra n. 3.

Dissatisfied with their lot under the settlement they had agreed to, petitioners filed with FERC a request for a public conference "in the nature of a Commission investigation concerning the curtailment plan and related practices of El Paso." J.A. at 1. Over a year later, on October 20, 1986, the Commission declined to open an

investigation, concluding (1) that "the use of profiles instead of MCDDs was a major bargaining point in the settlement," El Paso Natural Gas Co., Order Denying Petition, 37 F.E.R.C. (CCH) ¶ 61,024 (Oct. 20, 1986), J.A. at 179, 180; (2) that El Paso's purchasing practices to meet the agreed-upon profiles were more appropriately subject to challenge in "an El Paso section 4 rate case or purchase gas adjustment proceeding," id. at 181; (3) that much of petitioners' allegations represented, upon analysis, "a collateral attack on Order No. 380 and Commission orders approving the rate design for the Canadian suppliers," id., proceedings in which the East-of-California companies had participated; (4) that petitioners were fully empowered to take advantage of liberalized opportunities to swing and to require El Paso to transport the fruits of their swinging; and (5) that the fact that the parties had pessimistically anticipated continuing gas shortages did not warrant revisitation of a settlement to which the petitioners themselves had fully agreed. The Commission summarized this final point in the following way:

We do not believe that the settlement agreement should be changed to fashion a new remedy at this point simply because a risk taken by some of the parties to the agreement turned out badly.

Id. at 182.

For the foregoing reasons, the Commission stated that it was "unpersuaded that the currently effective El Paso curtailment plan has become unjust, unreasonable or unduly preferential and discriminatory as a result of unforeseen changes in circumstances or that a Commission investigation of the plan is the proper forum for review of the purchasing practices allegations by the EOC Companies." Id.

## II

Petitioners' challenge boils down to three main points: *first*, that the Commission

---

4. In their original petition for a conference, petitioners set forth the harm resulting from El Paso's curtailment plan in decidedly speculative or hypothetical terms. See J.A. at 9. While we ordinarily are very reluctant to decide cases based on future contingencies, it appears that at least some of the feared effects have come to pass (or indeed had already done so at the time

of the petition, notwithstanding its generally speculative tone, see J.A. at 14). Moreover, because the Commission did not rely on the speculative nature of petitioners' harms in denying the petitions, we are foreclosed from doing so under settled principles. See SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

substantively revisited and approved the settlement provisions as just and reasonable under federal law, thereby triggering full-fledged "arbitrary and capricious" review; *second,* that even under the more deferential standard of review (which we shall presently describe) articulated in *General Motors Corp. v. FERC,* 613 F.2d 939 (D.C.Cir.1979), and urged upon us by FERC as applicable to this case, the Commission's reasoning fell short by failing to consider the factors raised by the petition; and *third,* that regardless of the adequacy of FERC's order denying the petition, petitioners enjoy, in the circumstances of this case, a statutory right to a hearing under section 5 of the Natural Gas Act (NGA), 15 U.S.C. § 717d (1982).

### A

■ We can readily dispose of petitioners' first argument. In our view, the Commission quite plainly decided not to investigate or otherwise substantively revisit the terms of the settlement agreement. Read as a whole, the orders point unmistakably to the conclusion that the Commission decided only that petitioners' allegations did not warrant an investigation to reevaluate an agreement to which the petitioners themselves had subscribed. In essence, the Commission concluded that the various allegations were insufficient to trigger an investigation.

The "hard" reading of the solitary sentence featured by petitioners [5] is but another example of the familiar litigation tactic of focusing the adversarial spotlight on a small portion of a much greater whole and brushing aside the remainder. Dispassionately read, the order articulated a limited conclusion that no investigation was warranted. FERC has disavowed any intent to determine on the merits anything other than that insufficient evidence had been presented to warrant the expenditure of agency resources which would be necessary to conduct a full-fledged investigation. This is buttressed by the fact that the Commission suggested different procedural avenues by which petitioners could pursue their claims, as we shall more fully discuss in a moment. In our view, the decision at hand was plainly a decision not to investigate; it was not, as it were, a summary disposition on the merits.[6]

### B

■ Moving to petitioners' principal argument, we are persuaded that the standard articulated by this court in *General Motors* governs the situation at hand. In brief, *General Motors* held unreviewable a Commission determination not to initiate an investigation into the continuing lawfulness of a curtailment plan. In fashioning a decidedly deferential standard of review, the *General Motors* court stated:

---

5. Petitioners would have us focus, to the exclusion of the remainder of the orders, on the following sentence:

   In conclusion, we are unpersuaded that the currently effective El Paso curtailment plan has become unjust, unreasonable or unduly preferential and discriminatory as a result of unforeseen changes in circumstances or that a Commission investigation of the plan is the proper forum for review of the purchasing practices allegations by the EOC Companies. J.A. at 182. Contrary to petitioners' preferred reading of this sentence as a decision on the merits, the sentence could naturally be read as saying that circumstances had not sufficiently changed even to call into question the lawfulness of the curtailment plan; the use of the words "as a result of" supports such a reading. There is, in short, greater ambiguity here than initially meets the eye. *Cf. Young v. Community Nutrition Inst.,* 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986).

6. On petitioners' request for rehearing the Commission again declined to initiate an investigation. *See El Paso Natural Gas Co.,* Order Denying Rehearing and Clarifying Order, 36 F.E.R.C. (CCH) ¶ 61,262 (Dec. 19, 1986), J.A. at 228. The Commission stated that no legal or policy basis had been presented for what it termed the "potentially sweeping" change in El Paso's role into purely a transportation pipeline, as had been suggested in one request for rehearing. *See* Request for Rehearing, J.A. at 207, 212. Viewing the question as one derivative of the previous challenges relating to El Paso's purchasing practices, the Commission reaffirmed its decision not to open an investigation. FERC also granted El Paso's request for clarification of its initial order. (El Paso had joined petitioners in their initial request that the Commission convene a conference, but did not join the petitions for rehearing at the agency level; nor is El Paso a party in this court.)

In general, an administrative agency's decision to conduct or not to conduct an investigation is committed to the agency's discretion. If an agency considers all the relevant factors so that a court can satisfy itself that the agency has actually exercised its discretion, an agency's decision *to refrain from investigation is unreviewable.*

613 F.2d at 944 (citations omitted).

Although the term "unreviewable" may be somewhat of a misnomer, our review is certainly delimited in scope: If we conclude that the Commission actually considered and disposed of the arguments presented to it, we will defer to its conclusions. We may properly overturn the agency's decision only if we are convinced that the agency failed to do its job, namely to exercise its considered discretion.

Under *General Motors'* deferential standard, we are satisfied that the Commission's actions assailed by petitioners pass muster. Virtually all of petitioners' arguments boil down to disagreements with the Commission's results, rather than allegations that the agency truly failed to tackle the issues at all. In the main, petitioners cannot contest that the Commission's treatment of the issues satisfied *General Motors'* strictures. Petitioners do quarrel, however, with several aspects of the Commission's orders as failing to consider factors raised in the petitions or as resolving them contrary to the public interest. It is to those specifics that we now turn.

Petitioners contend primarily in this respect that the Commission ignored their basic concern: that El Paso's curtailment plan, as a result of changes in the natural gas market and the regulatory environment, had become unjust and unreasonable under the terms of the NGA. In petitioners' view, the adverse impact of recent deregulatory initiatives were relevant factors that the Commission simply ignored in denying their request for a conference.

We disagree. The Commission's orders do not suggest agency obliviousness to the changed regulatory regime and its potential adverse effects on petitioners. Instead, the Commission viewed these arguments as constituting either a collateral attack on prior orders (in the underlying proceedings of which the East-of-California companies had participated) or a *post hoc* effort to extricate themselves from a settlement gone bad.

Petitioners also maintain that the Commission "misunderstood" their point that regulatory changes, not merely market gluts, placed them in their current unfavorable position. To support this view, petitioners note that FERC referred to bargaining in the course of settlement negotiations over the use of curtailment profiles rather than contract demand levels (MCDDs) and the risk the parties undertook in reaching their accord. Petitioners contend, not without force, that absent the dramatic regulatory transformation of recent years, their position—even with curtailment profiles and a market glut—would be less unfavorable today than it has indeed turned out to be. In failing to consider the impact of deregulation on the curtailment plan, petitioners argue, FERC ignored a relevant factor and therefore failed to heed *General Motors'* teaching.

Upon analysis, however, petitioners make only half an argument. For the negotiated settlement and its concomitant risks were assuredly relevant factors which the Commission had to consider in exercising its discretion; the Commission was, accordingly, justified in referring to and relying on those factors. Petitioners complain more specifically that FERC did not go further and address the merits of their arguments that deregulation itself required the opening of an investigation into the curtailment plan. But FERC did not ignore their arguments. Rather, the Commission stated that the arguments had been considered in prior FERC proceedings and that current circumstances did not warrant reconsideration of the policies enunciated in the course of those proceedings; moreover, those deregulatory initiatives had, in the main, been found to be in the public interest. The Commission also responded specifically to petitioners' argument that the open access provisions of Order No. 436 would further exacerbate

the negative effects of the curtailment plan. FERC stated in this context that the harm to petitioners was speculative and that, in any event, petitioners enjoyed the same opportunities as the California customers to utilize El Paso as a provider of transportation services.

Thus, contrary to petitioners' protestations, FERC did consider the alleged effects of deregulation on the curtailment plan. Piercing the rhetoric, petitioners' essential point, it seems to us, is that the Commission was wrong: "When put into proper perspective, the only reasonable conclusion is that the[ ] radical changes [in the natural gas industry] necessitate a review of the existing curtailment plan." Joint Brief of Petitioners at 37. Petitioners fail to recognize, however, that the Commission was required in this context only to consider the arguments and to exercise its discretion. Once we determine that the agency met these *General Motors*-ordained requirements, our task is at an end.

### C

■ Finally, petitioners claim that section 5 of the NGA, 15 U.S.C. § 717d,[7] affords them on demand a right to a hearing on the justness and reasonableness of the curtailment plan. They set forth an elaborate argument based on the language and legislative history of the statute, the combination of which they contend demonstrates that gas distributing companies enjoy a hearing right triggered by a simple request to the Commission. Under the circumstances of this case, we cannot agree. In our view, no trial-type hearing was mandated because no material issues of fact were raised that would require the Commission to resolve petitioners' claims in a section 5 hearing.

The Commission correctly points out that section 5 never mandates a hearing, *unless* material issues of fact are raised. *See Consolidated Oil & Gas Co. v. FERC*, 806 F.2d 275 (D.C.Cir.1986); *Cerro Wire & Cable v. FERC*, 677 F.2d 124 (D.C.Cir.1982). Petitioners agree, as they must, that our cases provide for this common-sense flexibility in determining whether a hearing is required. This is so notwithstanding their otherwise sweeping (and unacceptably so) claim to "an absolute right to a hearing under Section 5." Joint Brief of Petitioners at 33.

Thus, to justify requiring the Commission to devote the resources required by a formal investigation, petitioners are obliged to raise material issues of fact. In our judgment, the petitions in this case raised no such issues (with one arguable exception) sufficient to mandate initiation of a section 5 investigation. The only material issue of fact arguably raised by the petitions relates to the impact of El Paso's curtailment obligations on its natural gas purchasing practices and the subsequent impact of those purchases on El Paso's customers.

As to this issue, however, we are satisfied that the Commission was justified in deferring consideration of these points to either a section 4 rate proceeding or a PGA proceeding.[8] It was well within the agen-

---

7. Section 5 of the NGA provides in pertinent part:

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification ... collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate ... to be thereafter observed and enforced, and shall fix the same by order....

15 U.S.C. § 717d(a).

8. Section 4 of the NGA provides in pertinent part:

Whenever [a] new [rate] schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission, or gas distributing company, or upon its own initiative without complaint ... upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate.... At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company....

15 U.S.C. § 717c(e). Purchase gas adjustment, or PGA, proceedings, governed by section 154.38

cy's discretion reasonably to order its business as it saw fit and to leave petitioners to their remedies in another type of proceeding. *Cf. El Paso Natural Gas Co.*, Order Denying Rehearing, Accepting Staff Report, and Establishing Hearing, 40 F.E.R.C. (CCH) ¶ 61,150 (Aug. 4, 1987) (stating that "[t]he issues raised by Southern Union ... are merely broad statements generally questioning aspects of El Paso's system operations, and do not provide the requisite [factual] basis for ... a section 5 investigation").

The Commission's interest in ordering its docket is especially strong here, where petitioners are seeking to reopen a settlement agreement to which they were themselves signatories. Moreover, the settlement, as we discussed earlier, was entered into only after long years of seemingly endless litigation and negotiation. The settlement, in addition, had the Commission's imprimatur as just and reasonable. We have had occasion more than once to observe the breadth of the Commission's discretion with respect to settlements, as well as the broad public interest favoring the settlement of complex rate matters. *See Arctic Slope Regional Corp. v. FERC*, 832 F.2d 158 (D.C.Cir. 1987); *United Municipal Distrib. Group v. FERC*, 732 F.2d 202 (D.C.Cir.1984). In these circumstances, we can scarcely condemn the Commission for declining to initiate an investigation, where the agency explicitly left the door ajar for either a section 4 proceeding or a PGA proceeding to resolve petitioners' specific allegations with respect to El Paso's purchasing obligations.

We full well recognize that petitioners are emphatically unenamored of a section 4 or PGA forum to air their grievances. In their view, the Commission's approach represents little more than a "shell game." To buttress their unfavorable view, petitioners point us to the Commission's actions in a pending rate proceeding, where in evaluating El Paso's purchasing practices the Commission refused to reopen the settlement agreement.[9] Petitioners thus paint an unflattering picture in which the Commission tells them to go to a rate proceeding to explore allegations presented in this case, and when they dutifully obey, the Commission then refuses in Kafkaesque fashion to afford them the promised avenue of review. In petitioners' view, this is "the kind of 'temporizing' condemned by this Court in *Maryland People's Counsel v. FERC*, 761 F.2d 768, 778 (D.C.Cir.1985)." Joint Brief of Petitioners at 19.

These concerns, we are satisfied, are premature as of this writing. FERC has squarely represented to us that meaningful review *will* be available to petitioners in a section 4 or PGA proceeding. If the Commission fails to keep its word, then the petitioners' grievances will presumably have ripened at that time. But we obviously leave that question to another day, content with FERC's assurances that two potential avenues do indeed exist to attack specific practices by El Paso which petition-

of the Commission's rules and regulations, 18 C.F.R. § 154.38 (1987), allow interstate pipelines to adjust their rates without going through the lengthy and complex procedures involved in a full scale rate adjustment proceeding under section 4 of the NGA, 15 U.S.C. § 711c.

9. In the next El Paso PGA proceeding following the Commission's order denying rehearing in this case, Southern Union attempted to reopen the settlement agreement in a fashion similar to their attempt here. *El Paso Natural Gas Co.*, 38 F.E.R.C. (CCH) ¶ 61,340 (1987), *reh'g denied,* 40 F.E.R.C. (CCH) ¶ 61,150 (1987), *appeal docketed,* No. 87–1537 (D.C.Cir. Sept. 30, 1987). The Commission refused to look into the underlying settlement, while remaining true to its representation in this case that it would examine the effects of the settlement on El Paso's gas purchasing practices. The Commission therefore viewed a formal hearing as "premature," and ordered a conference before an Administrative Law Judge to give the parties an opportunity to explore their allegations regarding El Paso's purchasing practices. *Id.; see also El Paso Natural Gas Co.*, Order Denying Rehearing, Accepting Staff Report and Establishing Hearing, 40 F.E.R.C. (CCH) ¶ 61,150 (Aug. 4, 1987). When the ALJ, following the Commission's lead, refused to revisit the settlement-ordained curtailment plan, Southern Union declined even to attempt to develop a record to substantiate possibly imprudent or unreasonable gas purchasing practices by El Paso. *See El Paso Natural Gas Co.*, Initial Decision, 41 F.E.R.C. (CCH) ¶ 63,002 (Oct. 15, 1987). In dismissing the docket for lack of prosecution, the ALJ discussed Southern Union's reasons for declining to pursue that proceeding further, which included hope for success in this appeal. *Id.*

**972**

ers may deem inimical under the regulatory system crafted by Congress to vindicate the public interest.

We cannot but observe in this respect that in a hearing set at their behest to examine El Paso's purchasing practices petitioners declined to introduce evidence to the effect that El Paso's practices have been unreasonable. *See El Paso Natural Gas Co.,* Initial Decision, 41 F.E.R.C. (CCH) ¶ 63,002 (Oct. 15, 1987); *see also supra* n. 8. Petitioners apparently believe that, as a matter of logic, the only effective redress available to them is to do away with the curtailment plan. But petitioners are not entitled to demand victory by virtue of their own notions of logic and orderliness in Commission proceedings. Like the common law, the administrative state is very much a common-sense affair, shaped by experience and consistent with the rule of law as laid down by Congress. In short, petitioners would be well-advised to set aside their logic-driven notions of how the Commission ought to order its business and to explore alternatives to their own theory —as the Commission has invited them to do—in future proceedings.

To be sure, petitioners complain more specifically that relegating them to a PGA proceeding is unreasonable in that it is unrealistic to expect meaningful results to come out of such a proceeding. In their view, the Commission requires the impossible by obliging them to prove their allegations in order even to get the chance to introduce evidence to prove their allegations. This is all the more unfair, they contend, where as here the evidence relating to El Paso's purchasing practices is in the pipeline's possession. Although we are not unmindful of the practical difficulties in petitioners' posture, we cannot but recall that problems of proof are commonplace in the world of agency adjudication; indeed, part of the burden in this type of litigation is to come forward with sufficient evidence to support factual allegations. As we have often noted, "mere allegations of disputed facts are insufficient to mandate a hearing; petitioners must make an adequate proffer of evidence to support them." *Cerro Wire & Cable v. FERC,* 677 F.2d 124, 129 (D.C.

Cir.1982); *see also General Motors Corp. v. FERC,* 656 F.2d 791, 798 n. 20 (D.C.Cir. 1981). Notwithstanding petitioners' dissatisfaction with the Commission's preferred fora, we find nothing improper in the agency's ordering its procedures as it has done in this case. *See Vermont Yankee Nuclear Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 544–46, 98 S.Ct. 1197, 1212–13, 55 L.Ed.2d 460 (1978).

In sum, the Commission has stated that it remains open to entertain petitioners' allegations in subsequent rate and PGA proceedings. Obviously, we do not know what the future will hold in this respect or whether petitioners will be able to adduce sufficient evidence pertaining to El Paso's gas purchasing practices to convince the Commission to reconsider the underlying settlement agreement. But we cannot, in conscience, blithely presume that the Commission is giving petitioners the "run around" or refusing to take their allegations seriously, at least until such time as they attempt to prove their allegations in the manner the Commission has invited them to pursue.

### III

For the foregoing reasons, we conclude that the Commission acted lawfully within its discretion; accordingly, the petitions for review are

*Denied.*