**ASSOCIATION OF MAXIMUM SERVICE TELECASTERS, et al., Petitioners,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,**

**Consumer Electronics Group, Community Broadcasters Association, Intervenors.**

**No. 85–1258.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 10, 1986.

Decided Aug. 9, 1988.

Paul G. Gaston, with whom William H. Allen, Jonathan D. Blake, Henry L. Baumann, Julian L. Shepard and J. Laurent Scharff, Washington, D.C., were on the brief, for petitioners.

Gregory M. Christopher, Counsel, F.C.C., with whom Jack D. Smith, General Counsel and Daniel M. Armstrong, Associate General Counsel, F.C.C., Washington, D.C., were on the brief, for respondents.

James L. Casserly and Gary J. Shapiro, Washington, D.C., were on the brief for intervenor Consumer Electronics Group of the Electronic Industries Ass'n.

Peter Tannenwald, Washington, D.C., entered an appearance for intervenor Community Broadcasters Ass'n.

Before STARR and SILBERMAN, Circuit Judges, and WRIGHT,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

* Senior Circuit Judge Wright was a member of the panel at the time this case was argued and the record remanded to the FCC, but did not participate in this opinion.

STARR, Circuit Judge:

This case is before us a second time. It involves federal regulation of "television receivers" and, more specifically, what constitutes a "receiver" so as to fall within the federal regulatory ambit. We previously remanded the record to the Federal Communications Commission for a clarification as to the scope and breadth of its order. Having now satisfied ourselves, in view of the Commission's subsequent statement, that the issues initially raised by the petition for review have not been rendered moot, we now proceed to resolve the merits. For the reasons that follow, we uphold the FCC and deny the petition for review.

I

The pertinent facts have been set forth in our earlier opinion, *Association of Maximum Service Telecasters v. FCC*, 791 F.2d 207 (D.C.Cir.1986), and can thus be briefly summarized. At issue is the applicability of FCC regulations promulgated pursuant to the All–Channel Receiver Act of 1962, 47 U.S.C. § 303(s) (1982). The regulations, in brief, require television receivers to be capable of receiving *all* FCC-allocated television frequencies. The operative language of section 303(s) grants the Commission "authority to require that apparatus designed to receive television pictures broadcast simultaneously with sound be capable of adequately receiving all frequencies allocated by the Commission to television broadcasting...." 47 U.S.C. § 303(s). Pursuant to this authority, the FCC promulgated 47 C.F.R. §§ 15.65(a) and 15.4(g) (1985), which essentially track the statutory language.[1]

In 1981, Sanyo Manufacturing Corporation began producing a "Specific Signal Display Device" ("SSDD"), intended for use with home computers, video games, video tape recorders, and cable television systems. Unlike ordinary television receivers, the SSDD is capable of receiving only two VHF frequencies (channels 3 and 4) which are necessary for it to function with cable television. Because the SSDD is not capable of receiving all FCC-allocated frequencies, Sanyo requested a waiver from the Commission's all-channel regulations so it could market the device in this country. In response, the FCC ruled that the SSDD did not fall within the ambit of its all-channel regulations and that a waiver was therefore unnecessary. The FCC interpreted the statutory language to apply only to devices that are "intended for reception of over-the-air signals." *Memorandum Opinion and Order ("Order")*, FCC 84–261 at 4 (released July 20, 1984), Joint Appendix ("J.A.") at 24. Since the SSDD was not intended to receive over-the-air signals (other than cable), the statute was held to be inapplicable.

Displeased by the FCC's pro-Sanyo interpretation, the Association of Maximum Service Telecasters ("Association") sought review. The Association contends that the Act's language requires any device, such as the SSDD, "capable" of receiving television pictures broadcast simultaneously with sound to meet the statutory requirements. The FCC, in contrast, argues that the Act applies only to devices "intended" to receive over-the-air signals.

This challenge thus presents the familiar situation of a question of statutory interpretation, to be resolved under the principles enunciated by the Supreme Court in *Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and its progeny. Those principles, mandating a two-step inquiry, are by now well understood. In the first step, the interpreting court focuses on whether Congress' intent is clear as to the precise question at issue. To do so, we employ "traditional tools of statutory construction." *Immigration and Naturalization Service v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1221,

---

**1.** 47 C.F.R. § 15.65(a) provides, in part: "All television broadcast receivers shipped in interstate commerce or imported from any foreign country into the United States, for sale or resale to the public, shall be capable of adequately receiving all channels allocated by the Commis- sion to the television broadcast service." 47 C.F.R. § 15.4(g) defines a television broadcast receiver as an "[a]pparatus designed to receive television pictures broadcast simultaneously with sound."

94 L.Ed.2d 434 (1987) (citing *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9). If, through this exercise, we determine that "Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9.

The reason undergirding *Chevron*'s Step One is to be found in democratic theory; judicial deference to agencies is, upon reflection, but one form of obedience to the will of the legislative body. The fundamental principle in our polity, even in the modern administrative state, is not deference, but the rule of law. Thus it is that in the non-bank bank case, the Supreme Court reminded us that "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors, FRS v. Dimension Financial Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986).

That, then, brings us to reminding the reader of *Chevron*'s Step Two: If we determine that "the statute is silent or ambiguous with respect to the specific issue, the question ... is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

## II

The Association argues that the meaning of the All–Channel Receiver Act is plain and clear. Its argument runs as follows: section 303(s) requires that all television receivers receive all television channels. Moreover, the statute requires any device with the "capability" of receiving television pictures broadcast simultaneously with sound to be equipped with the capability to receive all channels. The "capability" of the device is the determinative factor in assessing whether the apparatus is "designed" to fall within the Act's reach. Because the SSDD is capable of receiving only two channels, the Association maintains, it violates the Act.

We hasten to observe that both parties are in accord that the critical statutory language for our purposes is the phrase "[a device] *designed* to receive television pictures broadcast simultaneously with sound," 47 U.S.C. § 303(s); 47 C.F.R. § 15.4(a) (emphasis added). Brief for Petitioners at 12; Brief for FCC at 2–3. The Association argues that a device is "designed" to be a particular apparatus if it is technically "capable" of having the specific features that are characteristics of that apparatus. In the Association's view, the FCC contravened this clear language, as well as violating the underlying legislative intent to ensure uniformity in the broadcast reception arena.

As to the nature of the device itself, the Association attacks the FCC's position that the SSDD is more analogous to a monitor than to a television receiver. The SSDD, we are told, is technologically similar to a traditional television receiver; it contains a tuner, oscillator, and other standard receiver items. The Association further observes that Congress did not contemplate that the lack of an antenna would remove a receiver from the ambit of section 303(s). Brief for Petitioners at 12 n. 1 (citing H.R.Rep. No. 1559, 87th Cong., 2d Sess. 13 (1962)). Moreover, the SSDD, like a traditional receiver, can as we have seen receive some television frequencies, namely channels 3 and 4. A television monitor, in contrast, has *no* over-the-air broadcast reception capability. Under the Association's reading of the statute, any device capable of receiving even a solitary broadcast frequency constitutes a "television receiver" under the Act and is hence subject to the all-channel regulations.

Finally, the Association argues that the FCC's treatment of the device is internally inconsistent; the Commission determined that the device was not to be treated as a television receiver for purposes of the all-channel requirement, but was to be so treated for purposes of compliance with technical standards concerning broadcast interference. Brief for Petitioners at 7–8; Brief for Intervenor at 11. In the Association's sauce-for-the-goose view, application of one portion of the regulations mandates application of the regulations in their entirety, inasmuch as there is only a single

definition of a "television receiver" in the Act and implementing regulations. 47 C.F.R. § 15.4(g).[2]

For its part, the FCC argues that the statutory language vindicates its decision. The Commission's argument runs along the following lines: a device is only "designed" to be a television receiver if it is "intended" to perform the functions of a receiver, regardless of its potential technical capacity. Since the SSDD is not "intended" to be used to receive over-the-air television broadcast signals, it is "functionally akin to a television monitor ... and television monitors are not subject to all-channel regulation." Brief for FCC at 5. It was precisely because Sanyo realized the sharp distinction between the device it proposed to market and the traditional television broadcast receiver that it requested an exemption. Thus, in its *Request for Waiver of Part 15.68*, J.A. at 2–3, Sanyo emphasized that the SSDD was intended to display cable signals, not the full range of broadcast frequencies, and thus provided an inexpensive alternative to consumers who subscribed to a cable system.

In response to the Association, the FCC states that "it is merely a happenstance of current technology that an SSDD has any [over-the-air] reception capability." Brief for FCC at 8. The FCC points out that the SSDD's capacity to receive over-the-air signals is only necessary to enable the SSDD to "interface with cable television transmissions and the other video devices." Brief for FCC at 9. Eventually, predicts the FCC, cable technology will advance to the point where the signal will be carried exclusively through a "baseband," non-broadcast frequency. (All parties agree that, in such circumstances, a tunerless monitor would not fit within the ambit of the all-channel regulations. Brief for FCC at 8; Brief for Petitioners at 14). Since the SSDD is intended to be the functional equivalent of a television monitor, the Commission argues, it should be treated the

same way. The Commission reasons that the "purely technical and incidental" over-the-air reception capability of the SSDD does not trigger the statute's application. Brief for FCC at 9.

The FCC also takes issue with the Association's contention that it has somehow treated the SSDD in an inconsistent fashion. Since the SSDD has an oscillating tuner, it "poses the same interference threat as a broadcast-television receiver." *Memorandum Opinion and Order ("Reorganization Order")*, FCC 85–82 at 5 (released Feb. 26, 1985), J.A. at 32. Because of this potential for interference, it is necessary to require the SSDD to comply with technical regulations designed specifically to prevent interference. *Id.* However, it does not necessarily follow, the FCC argues, that the SSDD is to be subject to *all* technical regulations, regardless of their purpose. As the Commission puts it, "[t]he logic and necessity of applying one set of technical standards does not dictate the application of other technical standards to which logic and necessity do not apply." Brief for FCC at 11 n. 6.

### III

### A

■ As we turn now to the *Chevron* analysis, the pivotal question is the meaning of section 303(s). As we have seen, in the Association's view, the statute's inclusion of the word "designed" was calculated to make the "capability" of the device the determinative factor. The FCC counters that Congress meant, more broadly, the "intended" use of the device to be controlling.

A careful parsing of the statutory language weighs, if at all, somewhat in favor of the interpretation advanced by the Commission. First, in Congress' definition of the targeted device, the word "capable" appears in the very same sentence (ten

2. The Association also asserts that the Commission altered the meaning of the statute, and its own regulations, by paraphrasing the key section of the statute in its Order. The FCC used the phrase "designed *for reception* of broadcast transmissions," in its Order instead of the language of section 303(s), "designed *to receive* television pictures." Order at 4. (emphasis added). We fail to discern any significant difference in the Commission's paraphrase.

words later) to prescribe a requirement that a device (designed to receive television broadcasts) must fulfill. To state the obvious: If Congress, in drafting section 303(s), had wanted the Act to encompass all devices "capable" of receiving television broadcasts, surely it could have employed that term in that specific context. But it did not do so, a fact which tends to suggest that interpretive significance should be drawn from Congress' use of two different words. Second, the dictionary definition suggests the marginally more plausible nature of the FCC's interpretation. *Webster's Third New International Dictionary* 611 (1981) defines "design" in the following manner: "to plan or have in mind as a purpose." The dictionary lists as synonyms for "design" the words "intend," "purpose," and "contemplate." Again, if Congress had wanted to subject all devices "capable" of receiving television broadcasts to the Act, it could easily have so stated in plain terms. Moreover, the Commission's reading is supported by reference to the functions the SSDD is designed to perform. As the FCC points out, the SSDD is "functionally indistinguishable from unregulated television monitors." Brief for FCC at 6. That is, the SSDD is designed for use with video games, video recorders, computers and cable television; it is not intended to be used in a manner analogous to a television set (for reception of over-the-air signals).

But all this being said, the statute does not, upon analysis, yield itself only to the Commission's interpretation. To the contrary, for the reasons forcefully advanced by the Association (and which we have previously recounted), the FCC's approach is not without its weaknesses. And thus we are left with plausible interpretations advanced by both parties. If, of course, the interpretive exercise clearly supported one party's interpretation, our task would be at an end. Each side, however, has staked out quite sensible interpretive positions. "Designed," alas, admits of more than one meaning, as our discussion of the

parties' respective positions suggests. Thus, in the term "designed" is to be found that frequently encountered statutory disease, ambiguity. *See Young v. Community Nutrition Institute*, 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986) (noting that ambiguity is frequently encountered in legislation that could more naturally be deemed clear).

Nor does our analysis of the statute's structure yield any answer to the interpretive question. *See, e.g., United Savings Association of Texas v. Timbers of Inwood Forest Associates,* —— U.S. ——, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) ("[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme"). Indeed, the provision at issue stands alone; therefore, an analysis of the statutory scheme as a whole fails to shed any light on Congress' intent.

Finally, the legislative history is unhelpful. In crafting the All–Channel Receiver Act, Congress sought to "permit maximum efficient utilization of the broadcasting spectrum space, especially that portion of the spectrum assigned to UHF television." S.Rep. No. 1526, 87th Cong., 2d Sess. 2 (1962), U.S.Code Cong. & Admin.News 1962, pp. 1873, 1874. To accomplish this goal, Congress believed the requirements of the Act should cover devices "designed" to be television receivers; Congress did not, however, affirmatively state what sorts of devices fall into the television broadcast receiver category, leaving that gap-filling task instead to the agency. *See Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–82.[3]

B

■ Having determined that Congress' meaning is not entirely clear, the question before us is whether the agency's interpretation is "reasonable" or "permissible." *Chevron*, 467 U.S. at 843, 845, 104 S.Ct. at 2781, 2783. "Given the imprecision in the statute, the agency is entitled to choose any reasonable definition...." *K Mart*

---

**3.** We turn our attention to the *congressional purposes* informing the enactment of this legislation in the next portion of our opinion.

*Corp. v. Cartier, Inc.,* —— U.S. ——, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988).

We have little trouble concluding that it is. For one thing, as we saw above, the agency's interpretation represents a somewhat more natural (although not inexorable) reading of the statutory language. *See Continental Air Lines v. Department of Transportation,* 843 F.2d 1444, 1450 (D.C.Cir.1988). Nor does the agency's interpretation do violence to the goals Congress sought to achieve in enacting the All–Channel Receiver Act. *See id.* at 1452 (agency's interpretation must not be "patently inconsistent with the statutory scheme" (quoting *Rettig v. Pension Benefit Guaranty Corp.,* 744 F.2d 133, 152 (D.C.Cir.1984)). Congress' purpose in enacting the statute was "to permit maximum efficient utilization of the broadcasting spectrum space, especially that portion of the spectrum assigned to UHF television." S.Rep. No. 1526, 87th Cong., 2d Sess. 2 (1962), U.S.Code Cong. & Admin. News 1962, pp. 1873, 1874; *see also Electronic Industries Association Consumer Electronics Group v. FCC,* 636 F.2d 689, 696 (D.C.Cir.1980) (purpose behind the Act was a desire to achieve "UHF/VHF comparability").

Specifically, Congress wanted to provide a mechanism to allow UHF frequencies to compete effectively with VHF channels. The Senate Report states that "because of the nonavailability of television receivers which are capable of picking up UHF signals as well as VHF signals, the bulk of the UHF band is unused today.... This legislation is designed to remedy this situation." S.Rep. No. 1526, 87th Cong., 2d Sess. 2 (1962), U.S.Code Cong. & Admin. News 1962, p. 1874. The Senate Report contemplated that "[t]his goal would be achieved by eliminating the basic problem which lies at the heart of the UHF–VHF dilemma—the relative scarcity of television receivers in the United States which are capable of receiving the signals of UHF stations." *Id.* at 3, U.S.Code Cong. & Admin.News 1962, p. 1875.

Thus, to help assure economic viability of UHF channels, Congress desired that all television receivers be able to receive all television frequencies. Brief for Intervenor at 28. As the FCC explained in relating Congress' intent to the specific question at issue in this case:

> [Congress'] concern was to remedy a situation where the UHF television allocations were progressively being rendered less useful because fewer and fewer television sets could receive anything but the VHF channels. Here, we are not dealing with a technology that poses any real threat directed particularly to the use of the UHF spectrum, but rather one that provides consumers with a less expensive way to take advantage of the general display capabilities of the cathode-ray tube.

*Reconsideration Order* at 4, J.A. at 31.

With this animating legislative purpose in mind, we turn to the question whether the Commission's interpretation is inconsistent with it. We think not. As the FCC persuasively argues, Congress sought to ensure that all *television broadcast receivers,* even the most inexpensive, would be able to receive the UHF channels. But the SSDD is not a device to replace *television broadcast receivers.* To the contrary, it represents a less expensive vehicle for the viewer to display the images cable television projects. Indeed, the SSDD has no reasonable use as a broadcast receiver; it only becomes practically useful when employed in conjunction with a cable system (or video display etc.) (unless an idiosyncratic viewer is preternaturally attached to watching either channel 3 or 4 exclusively). Thus, the SSDD is for all practical purposes a neutral device, in that it is intended to display, without discrimination, the images it is fed by a cable system. The SSDD itself, quite unlike the discriminatory television sets of yesteryear, draws no distinction between UHF and VHF; to the contrary, it displays *all* channels that the cable system provides.

In this regard, the Association protests that, particularly when combined with this court's invalidation of the FCC's "must-carry" rules, the Commission's interpretation will undermine the statutory goals that

Congress meant to foster in enacting the All–Channel Receiver Act. *See Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434 (D.C. 1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986); *see also Century Communications Corp. v. FCC*, 835 F.2d 292 (D.C.Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2014–15, 100 L.Ed.2d 602 (1988). Specifically, the Association argues that, *sans* must-carry obligations, it is the unpopular UHF frequencies that will be left out in the cold by cable systems. The unhappy result will be that, in contravention of Congress' policy of even-handedness, SSDD users will lack access to the full range of channels available to viewers who own more traditional television broadcast receivers. Commissioner Quello, the Association emphasizes, expressed similar fears in his dissent from the FCC's Order.

These concerns are not without force. But upon reflection, we are satisfied that the requisite unreasonableness has not been demonstrated to warrant a court's tearing asunder the Commission's considered determination. As the FCC points out, the exclusionary situation decried by the Association flows from the business decision of cable companies not to carry less popular stations. We thus find ourselves ushered into the modern setting of cable's proliferation across the country. Having expanded from its rural, indeed mountainous roots, cable television has spread like a prairie fire with its availability, with the singular exception heretofore of the District of Columbia, becoming increasingly universal. As the FCC observes, cable television "carriage is not governed by the All–Channel Act or our all-channel rules ... [and t]o the extent that a cable system does not carry a local station—UHF or VHF, it makes no difference whether the subscriber uses a broadcast-television receiver, an SSDD, or a monitor." *Reconsideration Order* at 4. In short, the lacuna now lamented by the Association has more to do with cable and cable regulation (or lack thereof) than it does with a new sort of device which has emerged out of the cable-video era.

But there is another weakness in the assault on the FCC's approach. The Association's fear is, as the FCC observes, entirely speculative. Brief for FCC at 10–11. The SSDD is not, the agency tells us, designed to replace the tried-and-true family television set. Basically, the SSDD is yet another one of those luxury items, what Justice Catron long ago may have presciently had in mind when he spoke of "real or supposed extravagance[s]," *The License Cases*, 46 U.S. (5 How.) 504, 600, 12 L.Ed. 256 (1847); that is to say, consumers who suffer from limited wherewithal in this electronic age are singularly unlikely to purchase an SSDD in lieu of a TV set. The reason is obvious. The SSDD will not allow TV aficionados to receive channels (save for one) independent of a cable system, and there is an obvious economic disincentive to relying on the SSDD alone—the monthly cable fees can be quite expensive, especially over time. Because the SSDD is capable of receiving only two stations, it seems to us reasonable for the expert agency to conclude that the device will not dampen the ardor for UHF viewing any more than it will reduce the viewing of the many SSDD-"bypassed" VHF channels. Television watchers with limited marginal income, say federal judges, are unlikely to repair to Radio Shack, Crazy Eddie's or the like and embrace the SSDD in lieu of a TV set, at least if we assume, as we must, a rational consumer (protected from the evils of false advertising) acting in the marketplace.

The Association also mounts an argument to the effect that the FCC should not rely on the fact that Congress did not directly address the cable industry when it enacted the All–Channel–Receiver Act in 1962, for the obvious reason that the technology for cable systems was just developing and the advent of video game devices had not yet occurred. To the extent the argument has any force, we believe the FCC's analysis of the "functional" purpose of the SSDD effectively rebuts it. Since the SSDD is, as we have now indicated at length, not designed to oust the traditional television set from the consumers' contemplation, but to be a monitor delivering cable programming broadcasts (or video game-

playing etc.), the "happenstance of current technology" forcing the SSDD to receive the over-the-air signals of channels 3 and 4 does not render the device a television broadcast receiver for purposes of the Act.

In sum, we are satisfied that the Commission's interpretation of the Act is a reasonable one, which does no violence to the statutory scheme.

### C

 Finally, we address the claim that the FCC acted in an inconsistent manner. The reader will recall that the FCC determined that, although the SSDD does not have to comply with the requirements of a television broadcast receiver for purposes of the all-channel portion of the regulations, it must comply with the remaining portions. As the challengers see it, there is only one definition of a "television broadcast receiver" in the regulations; a device must either fall within that unitary definition or not.

The FCC responds, reasonably in our view, that applying the technical requirements to the SSDD was warranted to prevent interference with other frequencies. This regulatory action promotes Congress' goal of not allowing manufacturers to create functional impediments to bar the reception of all frequencies. Since the SSDD has an oscillating tuner, like a television broadcast receiver, it "poses the same interference threat as a broadcast-receiver" even though it is not used as one. *Reconsideration Order* at 5, J.A. at 32. That being so, it does not follow that, to modify an old metaphor, to regulate the bathwater means that it is necessary to regulate the baby. Logic does (or at least can) play a role even in the world of regulation. We agree, on reflection, with the Commission that "[t]he logic and necessity of applying one set of technical standards does not dictate the application of other technical standards to which logic and necessity do not apply." Brief for FCC at 11 n. 6.

\* \* \* \* \* \*

For the foregoing reasons, we conclude that the FCC's determination that the SSDD does not fall within the terms of the All–Channel Act represents a reasonable construction of the Act. The petition for review is therefore

*Denied.*